## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**REBECCA A. DAVIS AND**
**REBECCA A DAVIS FNP-C, LLC**

**VERSUS**

**BTL INDUSTRIES, INC, CYNOSURE,**
**INC., FIRST FEDERAL BANK AND**
**TRUST, STEARNS BANK, NA,**
**GREENWOODS EQUIPMENT**
**FINANCE, LLC, ME AND MY PAL,**
**INC., MMP CAPITAL, LLC AND**
**BANLEACO, INC.**

**CIVIL ACTION**

**NO._____**

## COMPLAINT FOR DAMAGES AND OTHER RELIEF

NOW COME Plaintiffs, Rebecca A. Davis and Rebecca A Davis FNP-C, LLC, through

undersigned counsel, who file this Complaint and respectfully represent as follows:

### PARTIES

1. Plaintiffs (collectively "Plaintiffs" or "Davis") are as follows:

(a) Rebecca A. Davis ("Ms. Davis"), an individual of the full age of majority, who is a

resident and citizen of the state of Louisiana and who has her primary business address at 7423

Picardy Avenue, Suite B, Baton Rouge, LA 70808; and

(b) Rebecca A Davis FNP-C, LLC ("Davis LLC"), doing business as Redstick Primary

Care, a Louisiana limited liability company, owned by Ms. Davis, which is a citizen of the state of

Louisiana and who has its primary business address at 7423 Picardy Avenue, Suite B, Baton

Rouge, LA 70808.

2. Defendants (collectively "Defendants") are as follows:

1

(a) BTL Industries, Inc, ("BTL"),  a privately owned global manufacturer of Medical and Aesthetic Equipment, which is a citizen of and domiciled in the United Kingdom, with the sole patent in the US for the Emsculpt body-contouring device and other non-invasive body-shaping procedures, who has never qualified to do business in the state of Louisiana or listed agents for service of process within this state, whose main office in the United States is located at 362 Elm St, Ste #5, Marlborough, MA 01752, and who has engaged in business in the state of Louisiana by selling and delivering equipment to Davis LLC in Louisiana;

(b) Cynosure, Inc. ("Cynosure"), a publicly traded corporation, which is a citizen of and domiciled in the state of Massachusetts, which manufactures and develops aesthetic treatment systems for non-invasive procedures, including laser and light-based energy equipment, who has never qualified to do business in the state of Louisiana or listed agents for service of process within this state, whose headquarters are located at 5 Carlisle Road, Westford, MA 01886, and who has engaged in business in the state of Louisiana by selling and delivering equipment to Davis LLC in Louisiana;

(c) First Federal Bank & Trust ("First Federal"), a national bank, which is a citizen of and domiciled in the state of Wyoming, who has not qualified to do business in the state of Louisiana or listed agents for service of process within this state, whose main office is located at 671 Illinois Street, Sheridan WY 82810, and who has engaged in business in this state by making a loan to Davis LLC for equipment purchased by Davis LLC secured by the equipment located in the state of Louisiana and by recording a UCC-1 in East Baton Rouge Parish to perfect its security interest in the equipment;

(d) Stearns Bank, NA ("Stearns"), a national bank, which is a citizen of and domiciled in the state of Minnesota, who has never qualified to do business in the State of Louisiana or listed

2

agents for service of process within this state, whose main office is located at 500 13th St, Albany MN 56307, and who engaged in business in this state by making a loan to Davis LLC for equipment purchased by Davis LLC secured by the equipment located in the state of Louisiana and by recording a UCC-1 in East Baton Rouge Parish to perfect its security interest in the equipment;

(e) Greenwoods Equipment Finance, LLC ("Greenwoods"), a commercial financing company, which is a citizen of and domiciled in the state of Wisconsin, who has never qualified to do business in the state of Louisiana or listed agents for service of process within this state, whose main office is located at 3212 Fiddlers Creek Drive, Waukesha, WI 53188, and who has engaged in business in this state by making a loan to Davis LLC to purchase equipment secured by the equipment located in the state of Louisiana and by recording a UCC-1 in East Baton Rouge Parish to perfect its security interest in the equipment;

(f) Me and My Pal, Inc. and MMP Capital, LLC, (collectively "MMP"), related commercial financing companies, which are citizens of and domiciled in the state of New York, who have never qualified to do business in the state of Louisiana or listed agents for service of process within this state, the main office for each of which is located at 19 Engineers Lane, Farmingdale, NY 11735, and who have engaged in business in this state by making loans to Davis LLC to purchase equipment secured by the equipment located in the state of Louisiana and by recording UCC-1s in East Baton Rouge Parish to perfect their security interests in the equipment; and

(g) Banleaco, Inc, formerly known as Bankers Leasing Company ("Banleaco"), a national lender for equipment purchases, which is a citizen of and domiciled in the state of Iowa, who has never qualified to do business in the state of Louisiana or listed agents for service of process within this state, whose main office is located at 11017 Aurora Avenue, Urbandale, IA 50322, and who

3

has engaged in business in this state by making a loan to Davis LLC to purchase equipment secured
by the equipment located in the state of Louisiana and by recording a UCC-1 in East Baton Rouge
Parish to perfect its security interest in the equipment.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. Sec.
1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants and
the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Both Plaintiffs are citizens of the state of Louisiana and all of the Defendants are citizens
of states other than the state of Louisiana. Plaintiffs seek damages and the voiding of contracts in
amounts in excess of $75,000, exclusive of interest and costs.

5. There is personal jurisdiction in this Court over defendants, BTL and Cynosure, because
they solicited purchases of equipment by Davis LLC in Louisiana, had Ms. Davis sign sales
contracts in Louisiana, and delivered equipment purchased by Davis LLC to it in Louisiana. There
is personal jurisdiction in this Court over defendants, First Federal, Stearns, Greenwoods, Me and
My Pal, Inc., MMP Capital, LLC, and Banleaco, because they had Ms. Davis sign loan documents
in Louisiana, had those loans secured by equipment located in Louisiana, and recorded UCC-1s in
East Baton Rouge Parish to perfect their respective security interests in the equipment.

6. Venue is proper in this District pursuant to 28 U.S.C. Sec. 1391(b)(2) because a
substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District
and a substantial part of the property that is the subject of this action is located in this District and,
in the alternative, pursuant to 28 U.S.C. Sec. 1391(b)(3), if there is no district in which an action
may otherwise be brought pursuant to this section, this District is one which the Defendants are
subject to this Court's personal jurisdiction.

4

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

7. BTL is a privately owned manufacturer of Medical and Aesthetic Equipment with the sole patent in the United States for the Emsculpt body-contouring device and other non-invasive body-shaping procedures. The company actively restricts the importation of products into the United States that infringe BTL's patents; thus, BTL has a monopoly on these products in the United States. The persons that engaged Ms. Davis for BTL were Reagan Sue ("Mr. Sue"), agent, managed by Reuben Boyd, who was managed by Kyle Wiesensee ("Mr. Wesensee").

8. On November 1, 2022, Mr. Sue, acting for BTL, the sole provider of the Emsculpt body-contouring products in the United State, pursuant to the monopoly as alleged in paragraph 7, approached Ms. Davis, inquiring if she would be interested in adding aesthetic services to her medical practice offered by Redstick Primary Care, her primary health care office. Prior to this, Davis never considered providing aesthetic services. Ms. Davis was acting as the representative for Davis LLC.

9. Mr Sue advised Davis that the Emsella Aesthetic System and Emsculpt Neo equipment would be beneficial purchases for her practice and would dramatically increase her cash revenue because the equipment was originally developed for medical purposes and that the services provided with the system were not billed to insurance and would create "thousands of dollars" in monthly cash income.

10. Ms. Davis was advised that BTL was targeting independent primary care practitioners to assist them to generate more income and that Ms. Davis could provide these services by purchasing the Emsella and Ensculpt Neo machines, as a package, and perhaps other complimentary machines, which would generate revenue immediately.

5

11. BTL's agents also told Ms. Davis that if she filed her tax returns as soon as possible, she would obtain a "rebate" through Section 179 of the Internal Revenue Code ("IRC") and that Ms. Davis would get a check for 35% of the purchase price, which she could use to pay on the loans. Unfortunately, this was false. Section 179 of the IRC is a provision that allows businesses to deduct 100% of the depreciation of purchased equipment for a tax credit, the year of purchase. The "rebate" is not sent to the purchaser in cash.

12. BTL recommended a two-machine package of the Emsella and Emsculpt Neo for $349,000. After obtaining Ms Davis' tax ID numbers and tax returns, BTL informed Ms. Davis that it was giving Ms Davis a free Cellutone device (a "free gift"). This "free" machine was actually included in the sale to provide additional collateral for the loan(s), for which the applications already had been completed. Instead of one loan, there were three separate loans from three separate lenders, for three separate amounts, one of which was secured by the "free" machine, and the others secured by the Emsella and Emsculpt Neo. Three loans provided the lenders with three loan fees, and the borrower, who could not qualify for one loan in the amount of $349,000, was approved for the three smaller loans.

13. Before Plaintiffs' machines arrived, BTL invited Ms. Davis to a conference in Nashville, Tennessee, on December 10-11, 2022, for the purposes of networking with other purchasers and attending informative break-out sessions for questions and answers. In Nashville, Mr. Sue advised Ms. Davis that Mr. Wiesensee asked to meet her. During that meeting, Mr. Wiesensee introduced Ms. Davis to the new Emface Laser machine and advised her that she needed to purchase one for her office.

14. Mr. Wiesensee told Ms. Davis that: (a) there was only one other Emface Laser machine in Louisiana, located in Shreveport, Louisiana; (b) he would make her office a training center for

6

the new machine if she purchased one; (c) people would come from all over the United States to her office to train on the machine, for which BTL would pay Ms. Davis $1,500 each session and provide the materials and supplies; (d) the designation of training center would last one year and would include a billboard; and (e) Ms. Davis' office also would be listed on the BTL machine's website for clients to see.

15. While in Nashville, Tennessee, Mr. Wiesensee learned that Ms Davis requested information on another company's machines, Cynosure's Icon, Elite IQ workstation, and Potenza workstation from Cynosure's agent, Jonathan Davila ("Mr. Davila"). Mr. Wiesensee advised Ms. Davis not to purchase the Cynosure equipment from Cynosure. Mr. Wiesenee told Ms. Davis that he was a former agent of Cynosure, that he knew a clinic in Louisiana who was selling its machine for $50,000, and that he could arrange that sale for her. After some time, Mr. Wiesensee advised Ms. Davis that the price went up to $70,000, and some time after that, that the price increased to $90,000.

16. Ms. Davis met with Cynosure's representative, Mr. Davila, at her office, who told her that both the Elite IQ workstation and Potenza workstation were "gateway" devices, that having both would dramatically increase her sales, that she needed both machines, and that he already had prepared documents for her signature. At all times herein, Mr. Davila acted for Cynosure.

17. From November, 2022, until January, 2023, Davis LLC "leased" several machines financed as follows: (a) Emsella financed by Stearns; (b) Emsculpt Neo financed by Greenwoods; (c) Cellutone (the free gift) financed by Banleaco; (d) Emface financed by First Federal; and (e) Emtone/Exion, financed by MMP. BTL sold the Emsculpt Neo system, Emsella, Emface Laser, and the Emtone and Exion workstations representing $807,334 of the sales proceeds. Cynosure sold the Elite IQ workstation and the Potenza, representing $260,000 of the sales proceeds.

18. Though described as "leases," the contracts presented to Davis as leases rarely or never contain the word "lease" in the four corners of the documents. All the forms appear to be sales with security agreements, with the exception of one promissory note and security agreement to First Federal. All the transfers used the equipment as collateral.

19. Many of the loan forms do not provide all of the information for the transactions, do not state the interest rates charged, and at least one states that Ms. Davis is 100% owner of the equipment at execution. Each loan form required a personal guarantee by Ms. Davis.

20. From December 15, 2022, until January 9, 2023, Davis LLC financed $867,334.45 in equipment, the agreements for which are as follows:

> (a) Equipment Finance Agreement to Greenwoods for an Emsculpt Neo System in the amount of $144,225.00, dated November 30, 2022, the proceeds of which were paid to BTL.
>
> (b) Equipment Finance Agreement to Banleaco in the amount of $76,460.50 for a BTL Cellutone Workstation dated December 1, 2022, the proceeds of which were paid to BTL.
>
> (c) Security Agreement to Stearns dated November 30, 2022, in the amount of $139,000.00 for an Emsella Aesthetic System, the proceeds of which were paid to BTL.
>
> (d) Commercial Loan and Security Agreement dated December 15, 2022, to First Federal in the amount of $247,648.95, at 10.250% per annum interest, for a 2022 Emface Laser S/N, the proceeds of which loan were paid to BTL.

(e) Equipment Finance Agreement dated December 30, 2022, for an Elite IQ

Workstation, in the amount of $150,000.00, to MMP, the proceeds of which were

paid to Cynosure, which was assigned to North Mill Equipment Finance.

(f) Equipment Finance Agreement dated January 9, 2023, to MMP in the amount of

$110,000.00 for a Potenza Workstation, the proceeds of which were paid to

Cynosure.

21. Within three weeks, $867,334.45 in aesthetic equipment was sold to Davis LLC, a single-member limited liability company owned by Ms. Davis.

22. Ms. Davis planned a soft opening with BTL's assistance on March 9, 2023, and a grand opening on March 16, 2023. The openings were planned as highly advertised events, with media coverage, and promotional packages. Neither event occurred. A "launch party" was scheduled which consisted of a bus tour on April 6, 2023, advertised from noon until 2 p.m. The bus did not arrive until 1:30 p.m., so few potential clients were still present. The promised BTL designer failed to attend and an account representative came instead. Although this event was supposed to yield $30,000 in promotional sales, no promotional packages were sold.

23. On March 25, 2023, Ms. Davis was invited to another BTL convention in Austin, Texas. At this event, Mr. Wiesensee met with Ms. Davis and advised her to buy an Emtone Workstation and an Exion Workstation. At this time, neither opening had occurred, the business had yet to become a training center for new BTL equipment and therefor had not received the $1500 fees per session, the billboard had not been provided, and the office was not yet listed with full designations for face and body on the website. Accordingly, Ms. Davis expressed concerns about purchasing more equipment.

24. Mr. Wiesensee advised Ms. Davis that there were incentives for the purchase of the Emtone Workstation and Exion Workstation, that as part of the purchase, Mr. Wiesensee would pay for training to be provided by Thea Darlow to Plaintiffs' employees, and that Plaintiffs also would get free network marketing ads for six months supplied by Dave Gorney.

25. On March 25, 2023, a fourth transaction for $200,000.00 was signed, represented by an Equipment Finance Agreement to MMP for an Emtone Workstation and an Exion Workstation, the proceeds of which were paid to BTL. Mr. Wiesensee told Ms. Davis that none of the incentives could be included in the documents for this transaction because Mr. Wiesensee needed to keep other purchasers from expecting incentives. The documents for the transaction also contained a confidentiality clause.

26. The final purchase in March of 2023 brought the total amount of equipment purchased by Davis LLC, within a 90-day period, to $1,067,334.45, with total monthly payments of $26,341.26 paid over five years with the total paid at the end of five years amounting to $1,587,448.16. All of the loans were personally guaranteed by Ms. Davis.

27. At the first of May of 2023, Plaintiffs first became aware that the equipment sale contracts and equipment loan contracts had been obtained by Defendants' fraudulent representations and/or material misrepresentations because as of that date: (a) the training office designation had not occurred, (b) the office was not listed as such on the BTL website, (c) the billboard promised with the purchase of the Emface was never provided, (d) the third-party agreements obligating BTL to pay for training on the Sculpture equipment never materialized, and (e) Dave Gorney's payments for network ads were stopped after two months. Without advertising and the other incentives, Plaintiffs attracted no new clients.

28. As a result of BTL, it's agents and assigns, defaulting on its obligation to provide the incentive items, the LLC could not pay the loans on the machines. After August of 2023, all loans were assessed with late fees and delinquent charges, increasing exponentially, which resulted in Plaintiffs' credit reputation being damaged beyond repair and Ms. Davis's ability to support herself and continue the practice of medicine was placed at risk.

29. BTL arranged all the financing for Davis LLC, as buyer, to have several smaller equipment loans instead of one large loan for three machines. BTL provided a "free" machine for the collateral for one of the loans.  BTL submitted multiple loan applications to different lenders, the proceeds of which were combined for payment of the large loan Plaintiffs could not get. BTL employees Reuben Boyd and Kyle Wiesensee advised Ms. Davis and did all the financing arrangements for the sales, and the applications were completed before Ms. Davis had been able to speak with them about the equipment.

30. Obtaining several loans from different lenders at the same time meant Plaintiffs were charged multiple loan fees. Enhancing the customer's purchasing power by submitting applications for multiple loans in smaller amounts with higher rates and fees and adding a free gift of equipment to meet the collateral required, assured BTL of a sale. The loan collateral was the equipment, the "free" machine provided by the seller, and a personal guarantee by Ms. Davis. This way the sale went through, without regard to the fact that BTL knew or should have known that this would damage and harm the buyer.

## BREACH OF FIDUCIARY DUTY

31. BTL voluntarily sent Plaintiffs' applications to specific lenders, taking control of the financing, not explaining Petitioner was signing several loans to pay for the $349,000 purchase

for which she could not qualify, resulting in Plaintiffs paying double or triple loan fees. This voluntary act placed BTL in a fiduciary relationship with Plaintiffs, acting as the more qualified and experienced contracting entity, advising Ms. Davis on financing, submitting her applications to specific lenders chosen by BTL, declaring to her that one machine was a "free gift," effectively providing extra machines as collateral to assist Plaintiffs in qualifying for the financing, all the while Ms. Davis believing that they were helping her through the process. As a fiduciary, BTL was legally bound to put the buyer's best interests ahead of its own by knowingly accepting a duty on behalf of another. BTL was required, as a fiduciary, to act as a prudent person in the buyer's best interest but did not.

32. Acting for both the buyer and the seller, BTL created a conflict of interest, arranging loans for the buyer, using its expertise in providing applications for several smaller loan amounts, at simultaneous loan closings, benefitting BTL with sales that it knew or should have known would ultimately harm a buyer that could not obtain a single loan for the total amount, and thereby breached its fiduciary duty to Plaintiffs causing them damage.

33. The loan contracts at issue were contracts of adhesion, drafted in favor of the lenders and seller, with a company that had a monopoly on the products, and contained non-negotiable terms. Complete details of the payment plans were not provided, such as interest rates or the total amount paid with financing. The contracts were personally guaranteed loans. The tax benefit information BTL provided was false. Additional provisions within the contract and not disclosed to the Plaintiff included a requirement that the buyer must charge BTL's suggested retail price for services on the purchased equipment or the equipment warranty would be terminated. Thus, BTL controlled the price that the buyer would be able to charge for services in using the equipment.

12

34. Due to the above facts, Plaintiffs claim that BTL, its employees, agents, and assigns, are liable for fraud in the inducement, which vitiates Plaintiffs' consent to the contracts by (a) misrepresenting or omitting details of the financing, (b)misleading Ms. Davis about the beneficial effect the purchase would have on her business, (c) assuming control of the financing, (d) never advising Plaintiffs of a right to seek alternate financing, and (d) making ancillary contracts with Plaintiffs as incentives that were not honored, all of which was with an intent to obtain an unjust advantage.

35. BTL, its employees, agents, and assigns, could not have obtained the sales using legal and ethical business practices. Instead, they devised a strategy to make one machine a "free gift" enabling them to combine loan amounts and possibly failed to inform the lenders of their methods in obtaining the loans.

## FRAUD IN THE INDUCEMENT

36. Concealment is described as the submission of fraudulent information on an application for a loan and is illegal in Louisiana. Pursuant to La. R.S. 51:2399.6 any person who willfully aids or abets another in making such a false or fraudulent application, claim, report, return, statement, invoice, or other instrument, or any person who willfully aids or abets another in providing any false or fraudulent information, shall be guilty of a felony punishable by fine, imprisonment, or both.

37. La. Civil Code article 1956 states that fraud committed by a third person vitiates the consent of a contracting party if the other party knew or should have known of the fraud. BTL knew of its fraud in obtaining the loans, was the ultimate beneficiary of the loans, and chose the

lenders, and thus had an obligation to inform the lenders of its fraudulent methods and actions in obtaining the loans.

## MONOPOLY

38. BTL possessed monopoly power as the sole patentee in a clearly defined economic and geographic market and proved its intent to maintain that power with lawsuits against companies attempting to sell like equipment in the United States. BTL controls the product prices and/or excludes competition in the United States market. La. R.S. 51:123 states that "no person shall monopolize or attempt to monopolize or combine or conspire with any other person to monopolize any part of the trade or commerce within this state," which, when applied to these facts, shows a lawful patentee manipulating financial contracts and resources of customers unrelated to the patent, in order to obtain an advantage that was not just being the sole vendor of the product. By gifting additional collateral for the buyer's use, choosing the lenders, and completing the financial contracts, BTL prevents prospective customers from shopping elsewhere for like products or services that may be more affordable.

39. Ms. Davis detrimentally relied upon BTL, its employees, agents, and assigns, and the other defendant lenders when BTL induced her to purchase equipment that it knew Plaintiffs would be unable to pay for, and the chosen lenders provided the loans. Plaintiffs paid duplicative fees and charges to multiple lenders and signed contracts of adhesion, causing irreparable damage to Plaintiffs. BTL and Cynosure both claimed she would obtain thousands of dollars in sales, completed her loan applications, which made them privy to her inability to obtain a larger loan, and therefore knew she could not repay three loans equaling the same amount. Plaintiffs were induced to sign financial contracts that both BTL and Cynosure knew were beyond Plaintiffs ability to pay, which caused Plaintiffs substantial harm and damages.

14

## INTENTIONAL MISREPRESENTATION

40. Alternatively, the above facts show that BTL, its employees, agents, and assigns, committed intentional misrepresentation by misrepresenting material facts to Ms. Davis with the intent to deceive her. She relied upon those statements made by BTL, its employees, agents, and assigns, and/or its chosen lenders and was justified in her reliance on those statements, and Plaintiffs thereby were substantially harmed and injured.

## NEGLIGENT MISREPRESENTAION

41. Alternatively, the above facts show that BTL, its employees, agents, and assigns, negligently misrepresented facts to Plaintiffs. The elements for such a claim of negligent misrepresentation are shown by the facts that: (a) BTL in the course of business had a pecuniary interest and either supplied misleading or false information, or sent in multiple loan applications to increase the fees and charges, (b) BTL had a legal duty to supply correct information to the Plaintiffs and/or Plaintiffs' lenders, (c) BTL breached that duty, and (d) Plaintiffs suffered pecuniary losses as a result of reliance upon BTL's omissions to the lender and misrepresentations to Ms. Davis.

## NEGLICENT INFLICTION OF EMOTIONAL DISTRESS

42. Ms. Davis has experienced and continues to experience emotional distress from BTL's actions and has exhibited physical ailments directly related to her company's financial crisis and inability to make payments on the contracts, including but not limited to, anxiety, depression, and insomnia. She goes to work each day, fearful that collectors will enter the office or equipment will be seized in front of her patients, and feels embarrassed and humiliated, and at times hopeless.

15

**BREACH OF CONTRACT AND FAILURE OF CONSIDERATION**

43. Based upon the foregoing facts, Defendants breached the equipment sale contracts and equipment loan contracts and as a result there was failure of consideration entitling Plaintiffs to have the contracts rescinded.

**UNFAIR TRADE PRACTICES**

44. BTL, its employees, agents, and assigns, and its co-defendants, are liable for unfair trade practices in their business methods. Unfair methods of competition and deceptive acts in commerce are unlawful under La R.S. 51:1405, the Unfair Trade Practices Law. BTL also was obligated to provide manuals, instructions, and a parts list to the buyer, Jones LLC, which it did not do.

45. BTL, its agents or employees, were contacted by Ms. Jones about the lack of training and the breach of the advertising agreement with no result.

46. "[C]onduct that violates the Unfair Trade Practices Act must involve fraud, misrepresentation, deception or unethical conduct." *McFadden v. Import One, Inc.*, 10-952 (La. App. 3 Cir. 2/9/11), 56 So. 3d 1212, 1220, quoting *Glod v. Baker*, 04-1483, p. 11 (La. App. 3 Cir. 3/23/05), 899 So.2d 642, 649, writ denied 05-1574 (La.1/13/06), 920 So.2d 238. As alleged herein, BTL and its co-defendants violated that Act by engaging in such acts and conduct.

47. Defendants are defined as "business opportunity" "sellers" and "agents" pursuant to La. R.S. 51:1821(1)(c),(2), (3),(4) because (a) they sold goods and/or services to Plaintiffs for the purpose of enabling Plaintiffs to start a business with those goods and/or services, (b) they guaranteed that the purchasers, Plaintiffs, would derive income from the business opportunity which exceeded the price paid for the business opportunity, (c) the initial required consideration

included consideration required by express condition or practical necessity, or for which the buyers, Plaintiffs, became obligated before commencement of the business, or during the following one hundred eighty days, (d) they were persons or entities which sold or offered to sell a business opportunity, and/or (e) they were persons who solicited prospective purchasers or negotiated on behalf of a seller.

48. In their business communications and contracts with Plaintiffs, Defendants have failed to comply with La. R.S. 51:1822, which requires a business opportunity seller, such as Defendants, to maintain a surety bond issued by a surety company authorized to do business in the state of Louisiana in the amount of $50,000.00 for the benefit and indemnity of a person suffering damages or loss as a result of the seller's dishonesty, unfair or deceptive practice, breach of the business opportunity sale, any duty arising therefrom, or violation of law. Business opportunity agents are required to maintain a similar bond in the amount of $25,000.00. Both sellers and agents are required to file the bonds with the Louisiana Department of Justice prior to doing any business in this state, including advertising or soliciting. Violation of the bond requirement is a criminal misdemeanor. Defendants have failed to comply with this bond requirement regarding their communications and contracts with Plaintiffs.

49. Defendants have engaged in acts prohibited by La. R.S. 51:1823 by (a) representing to Plaintiffs that a business opportunity would provide income or earning potential, failing to have documented data to substantiate the claims of income or earning potential, and failing to disclose this data to the prospective purchasers, Plaintiffs, at the time such representations were made, (b) failing to embody the all of the sale terms in a written agreement and/or failing to include in that agreement all material statements, representation, or promises made orally prior to execution of the written agreement by Defendants, and (c) offering or selling a business opportunity in

17

Louisiana to Plaintiffs without appointing the secretary of state as their agent in Louisiana authorized to receive service of process.

50. BTL engaged in price fixing, by participating in a minimum advertised pricing policy in all equipment sales. The suggested retail price for an Emsculpt NEO treatment is $850 and for an Emsculpt treatment is $750. Participating in the price plan has benefits, including being listed in the provider directory, getting a 2nd and 3rd warranty service at no charge, and getting a discounted price for replacement parts. However, if the buyer does not charge the suggested retail minimum price, BTL notifies them of non-compliance, and after two infractions, the buyer loses benefits, including warranty services. BTL will not allow buyers to make any price changes for treatments, nor participate in "buy one, get one" offers, low price advertising, social coupons, or being on discount sites. This is price-fixing, openly practiced by BTL.

51. BTL, Cynosure, Stearns, Greenwoods, Banleaco, First Federal, and MMP engaged in fraud, misrepresentation, deception, and/or unethical conduct when it made assurances to Ms. Davis that the equipment would create considerable cash income for her business and assisted Ms. Davis with financing to ensure she would qualify to purchase $349,000 in equipment, by surreptitiously dividing the amount into multiple smaller loans.

52. The co-defendant lenders had a legal duty to inform Ms. Davis of all features in the loan contracts, the interest rates applied, the payment amounts, and default features and to determine Plaintiffs' financial ability to repay the equipment loans, but failed to do so, and thereby aided and abetted BTL and Cynosure and became agents for BTL and Cynosure in their fraudulent scheme to sell equipment to Plaintiffs. The contracts were emailed in extremely small print.

53. BTL and Cynosure were aware of the amounts in the loans and continued to advise Ms. Davis to purchase equipment they knew she could not qualify for without "help" that was provided by BTL, its agents, employees, assigns, and co-defendants. The failure to provide instruction, the adhesive terms in the contracts, the failure to provide the agreed upon training and advertising, and the unfair trade practices that lured customers into its monopoly, enabled BTL to control more than the pricing of the products and made BTL and the co-defendants liable for the losses suffered and damages incurred by Plaintiffs.

54. Because the loans required a personal guarantee, Ms. Davis's inability to make payments of over $26,000 per month on the equipment threatens her ability to continue providing medical care to the community and threatens her personal income and assets.

## DAMAGES

55. The foregoing actions of Defendants have caused substantial damages to Plaintiffs, including, but not limited to, incurring liabilities for the equipment purchases and loans, which Plaintiffs do not have the financial ability to pay, amounting to the sum of $1,067,334.45 in principal, plus interest, late and delinquent charges, and creditor attorney fees on the equipment loans, damages to the credit ability and business reputation of Plaintiffs, and emotional distress, anxiety, depression, and insomnia caused to Ms. Davis.

56. In addition, Plaintiffs seek treble damages and an award of reasonable attorney fees and costs against Defendants for their unfair trade practices pursuant to the Unfair Trade Practices Law.

## RESCISSION OF CONTRACTS

57. Plaintiffs also seek judgment rescinding all contracts for purchases of equipment and all contracts for the equipment loans due the lack of consent of Plaintiffs vitiated by Defendants' fraud and/or intentional misrepresentation as described above and Defendants' breach of contracts and resulting failure of consideration.

## DEMAND FOR JURY TRIAL

58. Plaintiffs demand and request a trial by jury of this suit.

WHEREFORE, Plaintiffs, Rebecca Davis and Rebecca A. Davis FNP-C, LLC, pray for judgment as follows:

I. In favor of Plaintiffs, Ms. Davis and Davis LLC, and against Defendants, BTL, Cynosure, First Federal, Stearns, Greenwoods, MMP, and Banleaco, in the amount of such damages as are reasonable in the premises, together with judicial interest at the legal rate thereon from date of judicial demand until paid, and all costs of this suit.

II. In favor of Plaintiffs, Ms. Davis and Davis LLC, and against Defendants, BTL, Cynosure, First Federal, Stearns, Greenwoods, MMP, and Banleaco, for treble damages, together with judicial interest at the legal rate thereon from date of judicial demand until paid, reasonable attorney fees and costs as allowed by law, and all costs of this suit for violations of the Unfair Trade Practices Law.

III. In favor of Plaintiffs, Ms Davis and Davis LLC, and against Defendants, BTL, Cynosure, First Federal, Stearns, Greenwoods, MMP, and Banleaco, rescinding all equipment sale contracts and all equipment loan contracts.mend this petition pending discovery of additional facts

as the parties engage the legal process, and reserve all rights against Financial Partners Group, Kyle Wiesensee. Reagan Sue, Reuben Boyd and Jonathan Davila, and all assignees of lenders providing loans to Petitioner.

IV. Plaintiffs reserve the right to amend this complaint pending discovery of additional facts as the parties engage in the legal process and reserve all rights against Financial Partners Group, Kyle Wiesensee, Reagan Sue, Reuben Boyd, Jonathan Davila, and assignees of lenders providing equipment loans to Plaintiffs.

Respectfully submitted:

/s/ Lawrence R. Anderson, Jr.
LAWRENCE R ANDERSON (#02470)
Attorney at Law/Lead Attorney
11953 Coursey Blvd
Baton Rouge LA 70816
Telephone: (225) 324-7459
Facsimile: (225) 291-3030
Email: larry@lraattorney.com


DEBORAH BERTHELOT, LLC


/s/ Deborah Berthelot
DEBORAH BERTHELOT (#23650)
Attorney at Law
9100 Bluebonnet Centre Blvd, Ste 102
Baton Rouge, Louisiana 70809
(225) 924-9195; fax (225) 924-9199
Email: dberthelot@bigrivertitle.com

*Attorneys for Plaintiffs, Rebecca A. Davis and Rebecca A Davis FNP-C, LLC*